**NORWEST FINANCIAL, INC., Plaintiff,**

v.

**Juan Carlos FERNÁNDEZ and Gustavo Carlos Lanzillotta, Defendants.**

**No. 98 Civ. 6635(SAS).**

United States District Court, S.D. New York.

Jan. 12, 2000.

---

David Dunn, Davis Weber & Edwards P.C., New York, NY, for Plaintiff.

Eduardo L. Tabío, Oleg Rivkin, Fox Horan & Camerini LLP, New York, NY, for Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

In January 1998, plaintiff Norwest Financial, Inc. ("Norwest"), an Iowa corporation, purchased an Argentine consumer finance company named Finvercon S.A. Compañia Financiera ("Finvercon") from defendants Juan Carlos Fernández and Gustavo Carlos Lanzillotta, who remained with Finvercon as President and Vice President respectively. Within a few months, however, this once-promising business relationship turned sour. Norwest terminated defendants in September 1998, and the parties now look to this Court to decide the terms of their divorce.

On September 18, 1998, Norwest filed suit against defendants, seeking: (1) damages and indemnification for defendants' alleged breach of their contract with Norwest; (2) a declaratory judgment stating that Norwest properly terminated defendants; (3) injunctive relief relating to a non-competition clause contained in defendants' contracts with Norwest; and (4) injunctive relief and specific performance of a requirement contained in defendants' contracts with Norwest that defendants post collateral to cover payments of any deferred taxes.

Defendants answered Norwest's claims and filed counterclaims, seeking: (1) reimbursement of money paid to Norwest and Finvercon to satisfy a tax judgment against Finvercon, as well as reimbursement of other tax payments; (2) an order stating that Norwest must provide defendants with a full, detailed and chronological report of its good faith efforts to collect outstanding accounts receivable, verified by an independent auditor or examiner, before Norwest can demand any reimbursement of those accounts receivable; (3) an order stating that Norwest must provide defendants with a full and detailed accounting of the status and maintenance of certain reserve funds, verified by an independent auditor or examiner; (4) a declaratory judgment stating that Norwest is required to assign all of its right, title and interest in certain accounts receivable to defendants simultaneously with defendants' reimbursement of those accounts receivable to Norwest; and (5) a declaratory judgment stating that Norwest is required to offset certain losses against a

reserve fund before demanding reimbursement from defendants.

Jurisdiction is based on 28 U.S.C. § 1332. Norwest is a citizen of Iowa, and defendants each are citizens of the Republic of Argentina; the amount-in-controversy exceeds $75,000. *See* Joint Pretrial Order ("JPTO"), at ¶ 2. Venue is proper and personal jurisdiction is established by the agreement and consent of the parties, pursuant to the terms of the contracts between Norwest and defendants. *See id.* A non-jury trial was held on October 21–November 2, 1999. The following constitutes the Court's findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### A. Negotiation and Execution of the Agreements

On or about July 30, 1997, Norwest entered into a series of three agreements with defendants to acquire all of the outstanding stock of Finvercon. The three agreements consisted of a Stock Purchase Agreement ("Purchase Agreement") and two Seller's Director Agreements ("Director Agreements"). The parties entered into all three agreements contemporaneously. *See* JPTO, Undisputed Facts at ¶ A ("Undisputed Facts"). Both sides agree that the Purchase Agreement and Director Agreements documented a single, integrated transaction by which Norwest acquired Finvercon. *See* JPTO, Plaintiff's Contentions at ¶ 19 ("Pl.Cont."); JPTO, Defendants' Contentions at ¶ 10 ("Def.Cont.").

The Purchase Agreement details the terms and conditions of the stock purchase. The Purchase Agreement also contains representations and warranties of both the buyer (Norwest) and the sellers (defendants). *See* Plaintiff's Exhibit ("Pl. Ex.") 1. The Purchase Agreement is governed by New York law. *See* Pl.Ex. 1, at § 13.12.

Each Director Agreement details the terms and conditions under which Fernández and Lanzillotta would remain as members of Finvercon's Board of Directors following the sale of Finvercon to Norwest. In addition, Fernández's Director Agreement provided that Norwest would appoint Fernández as Finvercon's President, while Lanzillotta's Director Agreement provided that Norwest would appoint Lanzillotta as Finvercon's Vice President. The Director Agreements, which are substantially similar to each other, contain provisions relating to compensation, restrictions, and discharge; they also provided that Fernández and Lanzillotta would serve for a term of three years, although each could be removed immediately for cause or unacceptable performance, as defined in the Director Agreements. *See* Undisputed Facts at ¶ B; Pl. Exs. 2, 3. The Director Agreements are governed by Argentine law. *See* Pl. Exs. 2, 3, at § 5.

The Purchase Agreement and the Director Agreements were negotiated over an extended period, with each party advised by Argentine and American counsel of its choosing. *See* Undisputed Facts at ¶ C. Both Fernández and Lanzillotta were experienced businessmen. *See* Trial Transcript ("Trial Tr.") at 609–14, 953–56. Although Fernández testified that neither his Argentine nor his American counsel reviewed his Director Agreement, he also stated that he read and understood his Director Agreement and made a conscious choice not to consult counsel. *See id.* at 253–54, 259–64.[1]

The purchase and sale provided for in the Purchase Agreement took place on January 7, 1998 (the "Closing"). *See* Undisputed Facts at ¶ A. On that day, Norwest appointed Fernández and Lanzillotta as President and Vice President, respectively, of Finvercon. *See* Trial Tr. at 623, 975–76.

---

1. Fernández's assertion that his attorneys never reviewed the Director Agreement is highly suspect, because the Director Agreement is mentioned in the Purchase Agreement, which was reviewed by his attorneys. *See* Trial Tr. at 259–262.

Emilio Iribarren, the former President of Island Finance, a subsidiary of Norwest, testified that Norwest originally preferred to enter into employment contracts with defendants but was dissuaded by Fernández. *See id.* at 75–76. According to Iribarren, Fernández explained to Norwest that it was common in Argentina for Presidents and Vice–Presidents not to be employees of their companies and that the arrangement would have tax advantages both for Norwest and for defendants. *See id.* Iribarren testified that, as a result of this request, defendants were paid compensation instead of a salary and were named to Finvercon's board of directors. *See id.* at 76. While defendants dispute this testimony, I find that Iribarren's version is accurate.

Under their Director Agreements, Fernández and Lanzillotta were paid yearly compensation of $230,000, plus ½₂ of that figure, for a total of $249,166.67. *See* Pl. Exs. 2, 3, at § 1.2(a). In addition, the Director Agreements provided for a bonus linked to Finvercon's net profit. *See id.* From January through August 1998, defendants received monthly payments of $20,763.89 from Finvercon. *See* Pl.Ex. 62. Those monthly installments, if multiplied by 12 months, would total $249,166.67. Thus, Finvercon paid defendants the compensation described in § 1.2 of their Director Agreements for January through August 1998.

## B. Credit Losses

Before its purchase by Norwest, Finvercon was a consumer finance company that carried out a diverse range of banking operations. *See* Trial Tr. at 610. Among other activities, Finvercon made loans to individuals, either through unions or other intermediaries known as "mutuales," and to commercial entities. *See id.* at 124, 145–47, 610. Collectively, these loans constituted Finvercon's accounts receivable. *See id.* at 88, 521. In addition, Finvercon

sold packages of its loans to other finance companies; these packages constituted Finvercon's "sold obligations." *See id.* at 89–90, 525–531. On occasion, Finvercon would repurchase some of these sold obligations, and those loans were called "repurchased obligations." *See id.* at 531–33.

During the negotiations to purchase Finvercon, Norwest expressed concern that Fernández and Lanzillotta did not have sufficient reserves to cover Finvercon's outstanding credits. *See id.* at 86–88. Fernández and Lanzillotta took full responsibility for the collectability of Finvercon's portfolio, and they allowed Norwest to withhold a portion of the purchase price in order to guarantee the portfolio. *See id.* at 86–88. This withheld portion became known as the "Contingent Portion of the Purchase Price." *See id.* at 86–88; Pl.Ex. 1, at § 2.2(b).

At the time of the sale, Finvercon's financial statements reflected a number of outstanding loans that were severely past due. *See* Trial Tr. at 88. Finvercon had a reserve fund covering the full amount of these loans. *See id.* at 88–89. Pursuant to the sale, Fernández and Lanzillotta transferred that reserve fund to Norwest, as part of the Contingent Portion of the Purchase Price, and the severely past due loans remained on Finvercon's financial statements. *See id.* Fernández and Lanzillotta chose this arrangement because they believed the loans might still be collectible. *See id.* at 88–89, 114–15.

As part of the purchase of Finvercon by Norwest, the parties wrote several guarantees regarding these outstanding credits into the Purchase Agreement. *See* Pl.Ex. 1, at §§ 2.2(b), 7.1. Most important, defendants agreed to reimburse Finvercon and Norwest for any Credit Losses "[up]on demand." *See id.* Fernández admitted that he did not negotiate any right to audit or verify Norwest's Credit Loss determinations before paying them. *See* Trial Tr. at 99–100, 763.[2]

**2.** Fernández testified as follows: "We were in a company that was being audited by audi-

On September 28, 1998, in compliance with the notice provisions of the Purchase Agreement, Norwest demanded that defendants pay to Finvercon the sum of $2,405,794.43 on account of Credit Losses incurred by Finvercon. *See* Undisputed Facts at ¶ T; Pl.Ex. 34. In response to a request from defendants, Norwest provided an explanation of the amounts contained in its demand, but defendants did not pay. *See* Pl.Ex. 36.

During the following twelve months, Norwest made four more demands for payment of the Credit Losses—on October 21, 1998, February 5, 1999, July 27, 1999, and September 23, 1999. *See* Undisputed Facts at ¶¶ U, V, W, X; Pl. Exs. 37, 38, 39, 40. The amounts demanded by Norwest increased with each letter. On October 21, 1998, Norwest demanded $5,559,857.81, because it had added different accounts to its calculation of Credit Losses. *See* Pl.Ex. 37. On February 5, 1999, Norwest demanded $6,644,059.19, because of additional Credit Losses in the intervening months. *See* Pl.Ex. 38. On July 27, 1999, Norwest demanded $10,457,556.60, because of some corrections and additional Credit Losses in the intervening months. *See* Pl.Ex. 39. On September 23, 1999, Norwest demanded $13,561,984.29, because of additional Credit Losses in the intervening months. *See* Pl.Ex. 40. The supporting data attached to the September 1999 letter corrects several mistakes that Finvercon found in its earlier data. *See* Trial Tr. at 533–35, 539–40. During his deposition in connection with this matter, Fernández discovered an error in the September 1999 demand. *See id.* at 535, 539–42. Norwest corrected the error and sent a revised demand on October 22, 1999. *See id.* at 535–37; Pl.Ex. 102.

Norwest obtained the data for these demands from Finvercon's computer system. For the first three demands, the data was in Argentina. *See* Trial Tr. at 149–53, 518–19. Around May or June of 1998, however, the data was transferred to Norwest's headquarters in Des Moines. *See id.* at 519–21. The parties stipulated that this transfer of information was complete and accurate. *See id.* at 82.

In its demands, Norwest charged the following for each account receivable that had become a Credit Loss: unpaid principal and compensatory interest computed for the original life of the loan, punitive interest on any missed payments,[3] and unpaid VAT tax[4] on both the compensatory and punitive interest. *See id.* at 94–97, 484–86, 524–25. The rate of punitive interest was equal to one-half the rate of compensatory interest. *See id.* at 93–97, 524–25. Although the Purchase Agreement defines "Credit Loss" and "account receivable," it does not mention punitive interest. *See* Pl.Ex. 1, at §§ 2.2(b), 3.8. In addition, punitive interest was not reflected on Finvercon's books, because Finvercon charged punitive interest but did not accrue those charges in the customer accounts. *See* Trial Tr. at 96.[5]

Three categories of claimed Credit Losses deserve special note. First, Norwest claimed as Credit Losses the loans that were severely past due at the time of the Closing and for which Finvercon had a reserve fund. *See id.* at 88–89, 114–15. Second, Norwest claimed as Credit Losses

---

tors. It would be a redundancy to ask for something that's been audited to be audited." *See* Trial Tr. at 763.

3. As used by the parties in this case, "punitive interest" is not really punitive. Rather, it is compensatory interest on the amount of any missed payment, in order to "account for the lost time value due to [Finvercon] not having received that payment." Trial Tr. at 525.

4. Argentina charges a value added tax ("VAT tax") on accrued interest. *See* Trial Tr. at 93–

94. This tax must be paid when the interest accrues, even if the customer has not paid the interest. *See id.*

5. Norwest asked another witness whether compensatory interest was reflected on Finvercon's books, but did not ask about punitive interest. *See* Trial Tr. at 486. This omission supports the finding that punitive interest was not reflected on Finvercon's books.

certain loans for which debtors had made payments to the intermediaries—the unions or mutuales—who did not forward the payments to Finvercon; Finvercon negotiated with the intermediaries to secure those payments. *See id.* at 176–82. Third, Norwest claimed as Credit Losses several sold obligations that were not listed in the Purchase Agreement. *See id.* at 562–65.

## C. Deferrals of VAT Tax

Argentine law permits taxpayers to defer VAT taxes provided that they invest in certain promoted activities in specified geographic areas, a procedure known as the Tax Benefits Regime. *See id.* at 209–10. Prior to Norwest's acquisition of Finvercon, Finvercon had filed applications to defer various payments of VAT taxes, including applications for the months of February, March, and April 1997 to defer taxes totaling $317,500.00. *See* Undisputed Facts at ¶ D. Those applications were prepared by Salvador Pristera, an accountant who worked at Finvercon. *See* Trial Tr. at 789–790.

In February 1998, the Argentine branch of government responsible for the administration of taxation, known as the DGI, provided written notice to Finvercon that it had rejected Finvercon's applications to defer the VAT taxes. *See* Undisputed Facts at ¶ E. Pristera received this notification. *See* Trial Tr. at 767–68. Pristera testified that he informed Mario Olive, Finvercon's controller, of the problem. *See id.* at 769–70. Olive denied that Pristera notified him. *See id.* at 157. I credit Olive's testimony and find that Pristera did not inform him of the DGI's notification.

In April 1998, the DGI commenced legal proceedings against Finvercon to collect VAT taxes due and unpaid, for, among other periods, the months of February, March and April 1997. *See* Undisputed Facts at ¶ F. Pristera received notification of this claim. *See* Trial Tr. at 771. Pristera contacted the office of Ruben Pardo, a lawyer who regularly handled work for Finvercon; Pardo and one of his associates, Carla Baldini, handled the matter and, until July 1998, spoke only with Pristera. *See id.* at 773–74, 999–1007.

Pristera testified that he also informed Olive of the DGI's April claim. *See id.* at 771. According to Pristera, Olive told him to refer the matter to Pardo. *See id.* at 772. Pristera also testified that he informed Chris Keiser, the Norwest assistant general counsel overseeing the Carribean, Central America, and South America, that Finvercon had received a claim from the DGI. *See id.* at 772–73. Both Olive and Keiser denied that Pristera told them about the DGI's claim in April. *See id.* at 155–56, 489–91. I credit the testimony of Olive and Keiser and find that they did not learn about the DGI's claim in April.

In addition, both Olive and Keiser testified that Pristera had told them in September that he had notified Fernández of the tax problem, either in February or in April. *See id.* at 159–63, 497–98. Both also testified that Pristera told them that Fernández had instructed Pristera to refer the tax problem to Pardo. *See id.* at 159–64, 499. Finally, Keiser testified that Pristera told Keiser that he would deny ever making those statements. *See id.* at 514. At trial, Pristera testified that he never informed Fernández or Lanzillotta of the tax problem. *See id.* at 770–72. Pristera also stated that he did not tell Keiser that he would deny making certain statements. *See id.* at 814–15. Fernández and Lanzillotta testified that they first learned about the tax problem in August 1998. *See id.* at 312, 665, 969.

Regardless of what Pristera may or may not have said to Keiser or Olive, I credit the testimony of Fernández and Lanzillotta and find that they did not learn about the tax problem until August 1998. First, had Fernández or Lanzillotta learned of the tax problem any earlier, they would have engaged in the same flurry of phone

calls and meetings that marked late August and early September 1998. They certainly would not have allowed the interest and penalties to accumulate for months. Second, Fernández's testimony is supported by the testimony of Horacio Seligra, a public accountant whom Fernández regularly consulted on tax deferral matters. Seligra testified that Fernández first contacted him about the tax problem in August 1998. *See id.* at 949–53.

On August 26, Pardo called Fernández to inform him that the DGI had obtained a judgment against Finvercon. *See id.* at 312, 665. This judgment obligated Finvercon to pay the deferred VAT taxes, plus punitive and compensatory interest and other costs (the "tax judgment"). *See* Undisputed Facts at ¶ G. Pardo explained to Fernández that Finvercon's accounts might be seized as a result of this judgment. *See* Trial Tr. at 665. Fernández understood that Finvercon had to pay promptly in order to avoid seizure. *See id.* at 324. Fernández demanded that Pardo send him all of the information on the matter and then spoke with Pristera. *See id.* at 319–24, 665. After discussing the matter with Pristera, Fernández informed Keiser, Olive, and Iribarren. *See id.* at 313, 669. Olive, who was on vacation at the time, notified Eric Torkelson, Norwest's Controller, and Keiser. *See id.* at 157. Keiser informed Jim Goodson, Norwest's general counsel, John Sondereker, a Senior Vice President at Norwest, and Iribarren. *See id.* at 491–92. On the same day that Fernández learned of the tax judgment—August 26—he sent a fax to Iribarren and Keiser, in which he stated: "This matter does not cause any damage to Finvercon, and if it does, Gustavo and I will compensate for it." *See* Pl.Ex. 19. In addition, Iribarren, Olive, and Keiser all testified that Fernández had told them that he and Lanzillotta would compensate Finvercon for the tax judgment. *See* Trial Tr. at 110–11, 167, 493–94.

The Purchase Agreement contains several guarantees related to the tax defer-

rals. *See* Pl.Ex. 1, at §§ 2.2(c), 7.2, 7.3. On August 31, 1998, Norwest demanded, verbally and in writing, that defendants immediately pay to Finvercon the sum of $481,920.67 for the tax judgment. *See* Undisputed Facts at ¶ K; Pl.Ex. 20. Norwest repeated this demand, in writing, on September 2, 1998, and on September 3, 1998. *See* Undisputed Facts at ¶ K; Pl. Exs. 21, 22. Defendants did not satisfy these demands. *See* Trial Tr. at 496. On September 3, 1998, Finvercon paid the sum of $441,494.17 to Banco Hipotecario Nacional for the tax judgment. *See* Undisputed Facts at ¶ H. On September 8, 1998, Finvercon paid the additional sum of $41,529.00 to Banco Hipotecario Nacional for the attorneys' fees charged by the Argentine government to collect the tax judgment. *See id.*

On September 9, 1998, Ezequiel Camerini, a lawyer representing defendants, informed Norwest that, in his view, Norwest had failed to notify defendants about the tax problem in a timely fashion, as required by § 12.3(b) of the Purchase Agreement, and Finvercon had failed to raise all reasonable defenses to the tax judgment, as required by § 2.2(c) of the Purchase Agreement. *See* Pl.Ex. 25. On September 10, 1998, Norwest replied, stating that it had not learned of the tax problem until August 1998 but alleging that Fernández had known earlier. *See* Pl.Ex. 26. On September 14, 1998, Camerini stated that Fernández did not learn about the tax problem in February and indicated that defendants were trying to determine whether Norwest had raised all reasonable defenses. *See* Pl.Ex. 27. On September 16 and 17, 1998, Norwest sent letters to Camerini relating its view that it had raised all reasonable defenses and that defendants were liable for the tax judgment. *See* Pl. Exs. 80, 81. On October 8, 1998, defendants paid to Finvercon the amounts that had been demanded of them to satisfy the tax judgment. *See* Undisputed Facts at ¶ L. Fernández testified that he also paid off other deferred taxes

before their due date, in the amount of $1,800,000, between October 1998 and October 1999. *See* Trial Tr. at 673–74.

### D. Collateral for Deferred Taxes

Section 5.11 of the Purchase Agreement states:

Sellers shall provide to the Company at Closing collateral, satisfactory to Buyers, in the form of dollar-denominated bonds issued by the Republic of Argentina with a residual face value of not less than the amount of Taxes actually deferred as of the Closing.

Pl.Ex. 1, at § 5.11. At the Closing, defendants did not provide this collateral and Norwest did not demand it. *See* Trial Tr. at 332, 500–01, 675–76.

On September 10, 1998, Norwest demanded that defendants provide the collateral immediately. *See* Undisputed Facts at ¶ M; Pl.Ex. 26. On September 14, 1998, Camerini responded that Norwest had waived the posting of the collateral, both by failing to demand it at the Closing and through the statements of Shari Del Carpio, a Norwest employee. *See* Pl.Ex. 27. On September 16, 1998, Norwest indicated that it did not consider the collateral requirement to be waived and demanded that defendants post the collateral. *See* Pl.Ex. 80. Norwest reiterated its demand on September 17, 1998. *See* Pl.Ex. 81.

### E. Personal Lending by Fernández and Lanzillotta

In 1998, Fernández made personal loans to several companies and one individual while serving as President of Finvercon. *See* Trial Tr. at 292–307, 653–65. Four of the companies—Torrance S.A., Poliequipos S.A., Colomba Viajes S.A., and Obtener—had outstanding loans with Finvercon. *See id.* at 292–93. Two of the companies—Adicom S.A. and Lanci Impersores, S.R.L.—had never done any business with Finvercon. *See id.* at 306. The individual, Hugo Iurcovich, lived in Brazil and was either the President or Vice President of Colomba Viajes, which had outstanding

loans with Finvercon. *See id.* at 296–97. In 1998, Lanzillotta made loans to two commercial entities—Obtener, which had outstanding loans with Finvercon, and Suriser, which did not—while serving as Vice President of Finvercon. *See id.* at 966–68.

Fernández admits that he did not notify Norwest about most of his personal lending. *See id.* at 294, 307–08. He testified that he did ask Iribarren for permission to make some loans to Colomba Viajes and Obtener, although Iribarren stated at trial that Fernández only asked him about a short-term loan to Obtener. *See id.* at 103–08, 294–95, 311–12. I credit Iribarren's testimony and find that Fernández only asked permission to make a single loan to Obtener.

Prior to its purchase by Norwest, Finvercon had made a number of loans to commercial entities. *See id.* at 124. Norwest made clear, even before it purchased Finvercon, that Finvercon could not continue to make commercial loans after the Closing. *See id.* at 124. Indeed, once the Closing took place, Norwest instituted a policy against making commercial loans. *See id.* at 147–48, 623–24. In addition, Fernández testified that Finvercon could not and did not make loans to individuals outside Argentina. *See id.* at 663.

### F. Termination

On September 18, 1998, the shareholders of Finvercon, at a shareholders' meeting, removed Fernández and Lanzillotta as directors of Finvercon. *See* Undisputed Facts at ¶ O; Trial Tr. at 508–09. This shareholders' meeting consisted of John Sondereker, Mario Olive, Chris Keiser, and John Deal, head of Norwest's quality support unit. *See* Trial Tr. at 389, 508–09. Following this meeting, Olive became the President of Finvercon. *See id.* at 510.

On September 21, 1998, Sondereker met with Fernández and Lanzillotta. *See id.* at 389, 647, 970–73. The participants offer very different versions of what transpired at that meeting. According to Sonderek-

er, he told Fernández and Lanzillotta that they were being removed for cause, because they had not paid the tax judgment or posted the collateral; he also noted concerns with mismanagement. *See id.* at 389–90. According to Fernández and Lanzillotta, Sondereker did not mention the tax judgment or the collateral; rather, they claim that Sondereker said that Fernández was being terminated because he did not fit Norwest's "style" and Lanzillotta was being terminated because he was Fernández's partner. *See id.* at 647, 652–53, 970–73. Sondereker denies making these statements. *See id.* at 390–91.

I credit Sondereker's testimony and find that he told defendants that they were being terminated because they had not paid the tax judgment or posted the collateral. This finding is supported by the fact that, on the day of their termination, Norwest sent both Fernández and Lanzillotta written notice of their removal, indicating that "such revocation constitutes a termination with Cause as defined in clauses 1.4 and 1.5(a) of the Agreement, for reasons and events that are known to you." *See* Pl. Exs. 30, 31.

The removal of defendants was part of a larger shakeup at Finvercon. On the same day that defendants were notified of their removal, Norwest fired Pristera. *See* Trial Tr. at 154–55, 510–14, 811–14. In addition, Norwest already had removed Iribarren from his role of supervisor of Finvercon in early September. *See id.* at 129. Iribarren testified that this decision probably was related to the removal of defendants. *See id.*

## III. CONCLUSIONS OF LAW

### A. Credit Losses

#### 1. Payment of Credit Losses

##### a. Were defendants required to pay on demand?

The parties dispute when defendants were required to pay Norwest for claimed Credit Losses. Norwest argues that, under §§ 2.2(b) and 7.1 of the Purchase Agreement, defendants were required to reimburse Finvercon and Norwest for claimed Credit Losses on demand. Defendants contend that Norwest was required to offset any Credit Losses against the Contingent Portion of the Purchase Price, a reserve fund detailed in the Purchase Agreement, before demanding payment. Defendants also argue that they were not required to pay the claimed Credit Losses on demand, because they had concerns about the accuracy of those claims.

Section 2.2(b) of the Purchase Agreement states, in relevant part:

As referred hereinbelow, the Sellers [defendants] guarantee without limitation the Company [Finvercon] against any and all Credit Losses.... Sellers shall reimburse the Company for any guaranteed Credit Loss upon demand by the Company. However, if the accumulated guaranteed Credit Losses that are not reimbursed to the Company by the Sellers upon demand by the Company are less than the Contingent Portion of the Purchase Price, then Buyer [Norwest] shall pay Sellers an amount equal to the Contingent Portion of the Purchase Price less the accumulated guaranteed unreimbursed Credit Losses as set forth below.

Pl.Ex. 1, at § 2.2(b). Section 7.1 of the Purchase Agreement states:

Sellers jointly and severally undertake to reimburse Buyer on demand upon the occurrence of any Credit Loss and, thus, guarantee to Buyer that the Accounts Receivable shall be collected by the Company when and as due and that the Company shall not have to disburse any funds for any Sold Obligation. This guarantee obligation is absolute and Sellers waive any defense they may have against Buyer, including, but not limited to, any defense that the borrowers of the Company may have and any request that the Company exhaust all actions against any assets of the debtors of the

Company; Sellers also waive any right or claim of offset.

Pl.Ex. 1, at § 7.1.

Defendants breached the Purchase Agreement when they failed to pay Norwest for the claimed Credit Losses on demand. Sections 2.2 and 7.1 both clearly state that defendants had to pay "[up]on demand." *See PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir.1996) ("In interpreting a contract, '[w]ords and phrases are given their plain meaning. Rather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that agreement.'") (quoting *American Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 562 N.Y.S.2d 613, 614 (1st Dep't 1990)). Norwest made its first demand in September 1998 and made several subsequent demands over the next thirteen months. Defendants were obligated to satisfy those demands.

Defendants seek a declaratory judgment stating that Norwest was required to offset any Credit Losses against the Contingent Portion of the Purchase Price before demanding payment from them. Defendants rely heavily on the clause in § 2.2(b) that allows Norwest to deduct unreimbursed Credit Losses from the Contingent Portion of the Purchase Price (the "deduction clause"), but there are three reasons why that clause does not establish an offset requirement. *First*, nothing in the plain language of that clause indicates that Norwest was required to offset Credit Losses against the Contingent Portion of the Purchase Price *before* demanding payment from defendants. *Second*, the use of the phrase "Credit Losses that are not *reimbursed*" demonstrates that Finvercon had to demand reimbursement before Norwest could deduct the claimed Credit Losses from the Contingent Portion of the Purchase Price. *Third*, defendants' reading of the deduction clause creates an unnecessary conflict between that clause and the "upon demand" clause. *See Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 482 N.Y.S.2d 465,

468, 472 N.E.2d 315 (1984) ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless."). The two clauses can be harmonized by reading the deduction clause to apply only when Norwest is ready to pay defendants the Contingent Portion of the Purchase Price, which will not happen until all of the accounts receivable and sold obligations guaranteed by defendants have been liquidated. *See* Pl.Ex. 1, at § 2.2(b).

Other parts of the Purchase Agreement support this reading of § 2.2(b). First, § 2.2(a), which defines the Contingent Portion of the Purchase Price, states in relevant part:

> The Contingent Portion of the Purchase Price shall be equal to the provisions for credit losses reflected in the Closing Financial Statements (the "Closing Provisions") after the Closing Financial Statements are adjusted in accordance with Section 2.5(a), and it shall be reduced by Credit Losses guaranteed by the Sellers that are not reimbursed to the Company by the Sellers upon demand by the Company, and shall be paid to Sellers as set forth in Section 2.2(b).

Pl.Ex. 1, at § 2.2(a). As with § 2.2(b), § 2.2(a) does not mention any right of offset and the most natural reading of its language, which mirrors the language in § 2.2(b), is that the deduction takes place when Norwest is ready to pay defendants the Contingent Portion of the Purchase Price. Second, any lingering doubt about the Court's reading of § 2.2(b) is erased by the following unambiguous language from § 7.1: "Sellers also waive any right or claim of offset." *See* Pl.Ex. 1, at § 7.1. Thus, defendants' counterclaim for a declaratory judgment stating that Norwest is required to offset Credit Losses against the Contingent Portion of the Purchase Price is denied.

Defendants also argue that, even if Norwest was not required to offset the Credit Losses against the Contingent Portion of the Purchase Price, they did not have to

pay Norwest "on demand" because they had concerns about the accuracy of those demands. To support their argument, defendants have cited several examples of errors in Norwest's supporting data, some caught by Norwest and others identified by defendants. *See* pp. 216–17, *supra.* Nevertheless, Fernández admitted that defendants did not bargain for any audit or verification rights. *See* Trial Tr. at 99–100, 763. The lack of audit or verification rights is made all the more stark by the detailed provisions in the Purchase Agreement for making adjustments to Finvercon's financial statements after the Closing. *See* Pl.Ex. 1, at § 2.5. Because the Purchase Agreement contained no audit or verification rights, which the parties knew how to create, defendants were required to pay the Credit Losses "on demand" and breached the Purchase Agreement when they failed to do so. *See Lowy and Donnath, Inc. v. City of New York,* 98 A.D.2d 42, 469 N.Y.S.2d 760, 761–62 (1st Dep't 1983) (holding that defendant was required to make immediate payment where purchase order did not contain any language suggesting that payment was subject to prior audit or verification).

Separate from the issue of audit or verification rights, defendants could have refused to pay the specific Credit Losses about which they had concerns. In *Trademark Research Corp. v. Maxwell Online, Inc.,* 995 F.2d 326, 341 (2d Cir.1993), the Second Circuit approved the following jury instruction regarding New York law in this area: "[I]f you find that [defendant's] bills were false or materially inaccurate and that [plaintiff] made timely requests for correction of errors or documentation of the work done, then ... the failure to pay the *disputed* bills was not a breach of contract." Although defendants asked for clarification in response to the September 1998 demand, they did not raise any further concerns after receiving the clarification; they simply refused to pay. While defendants no longer worked at Finvercon,

and therefore did not have access to the underlying data, they could have—and should have—gone through the Credit Loss demands and initially identified the accounts about which they had concerns, because they could justifiably refuse to pay only those specific demands. Instead, defendants refused to pay the entire Credit Loss demand, without itemization. That refusal constituted a breach of the Purchase Agreement. *See id.* at 341 (jury instruction did not mislead jury into thinking that "a billing dispute over any one of the bills would relieve [plaintiff] from paying any or all of them").

**b. What were defendants required to pay?**

The parties also dispute what defendants were obligated to pay. Defendants agreed to reimburse Norwest and Finvercon for all Credit Losses, a term defined in § 2.2(b) as follows:

> Credit Losses are (i) any Account Receivable as of the Closing Date, or renewal or increase thereof, on which a full scheduled payment has not been made by an obligor thereon for 180 days, and (ii) satisfaction by the Company of any recourse or other obligation under Contracts identified at Exhibit 3.16(a)(1) ("Sold Obligations").

Pl.Ex. 1, at § 2.2(b). There are three types of Credit Losses: accounts receivable, sold obligations, and repurchased obligations. *See* p. 216, *supra.*

First, defendants argue that Norwest should not be allowed to claim as Credit Losses the seven or eight sold obligations that were not attached to the Purchase Agreement. But defendants were the ones who represented, in § 3.16(a)(i) of the Purchase Agreement, that "each Contract for the sale of loans on which the Company has obligations with respect to said loans ('Sold Obligations')" was attached. *See* Pl.Ex. 1, at § 3.16(a)(i).[6] Al-

---

**6.** Section 3.16(a) states, in relevant part:

Exhibit 3.16(a) contains a complete and ac-

curate list, and Sellers have delivered to

though Norwest should have notified defendants of the missing sold obligations, instead of simply adding those items as Credit Losses, that does not change the fact that Norwest assumed those obligations and should be allowed to recover for them.

 Second, the parties do not agree about the proper amount owed on the accounts receivable. The term "account receivable" is defined in § 3.8 of the Purchase Agreement:

> All accounts receivable of the Company that are reflected on the Balance Sheet or the Interim Balance Sheet or on the Closing Financial Statements or on the accounting records of the Company as of the Closing Date (collectively, the "Accounts Receivable") represent valid obligations arising from loans actually made in the ordinary course of business and are collectible. All payments shown on the records of the Company relating to the Accounts Receivable were made on the dates indicated on said records and were made by the obligor(s) thereon. The amounts shown on the records as being owing and unpaid on the respective Accounts Receivable represent the true and correct outstanding balances thereon. The information shown on the Company records relating to the respective Accounts Receivable is correct. There is no contest, claim, or right of offset with any obligor on an Account Receivable relating to the amount or validity of such Account Receivable.

Pl.Ex. 1, at § 3.8. With the exceptions set forth below, I conclude that, for each account receivable that qualifies as a Credit Loss, Norwest properly may demand from defendants: (1) unpaid principal, compensatory interest, and VAT tax on the compensatory interest; and (2) punitive interest for any missed payments and VAT tax on the punitive interest.[7]

The principal, compensatory interest and VAT tax on the compensatory interest simply constitute the account receivable itself—the amount on Finvercon's books under that account's entry. Punitive interest presents a more difficult problem, because it is neither recorded on Finvercon's books nor explicitly mentioned in the Purchase Agreement. Norwest argues, however, that the definition of "Credit Loss" includes punitive interest based on the following language in the Purchase Agreement: "Credit Losses are . . . any Account Receivable as of the Closing Date, or renewal or increase thereof. . . ." Pl.Ex. 1, at § 2.2(b). Norwest's interpretation of the word "increase" to mean punitive interest is indisputably correct, because the only way to increase an account receivable is to add interest on missed payments. Defendants, on the other hand, have offered no logical reading of the word "increase" that does not include punitive interest. In addition, Norwest's reading of the contract language is supported by the fact that Finvercon routinely charged punitive interest for missed payments while defendants were running Finvercon. *See* Trial Tr. at 484–86. Thus, Norwest's demand for punitive interest should have been no surprise to defendants.[8]

---

> Buyer true and complete copies (of Written Contracts), of:
> (i) each Contract with Argencard, Visa and Mastercard or other company that involves performance of services or delivery of goods or materials or loans by the Company (including, without limitation, each Contract for the sale of loans on which the Company has obligations with respect to said loans ("Sold Obligations")).

**7.** Norwest seeks punitive interest only for the accounts receivable, not for the sold and re-

purchased obligations. *See* Trial Tr. at 580–83, 594–96.

**8.** Although the Purchase Agreement entitles Norwest to recover punitive interest from defendants, that recovery nevertheless represents a windfall to Norwest, which never would have been able to collect the same amount—100% of all missed payments—from the delinquent debtors. Indeed, Norwest might only have collected a fraction of those payments from the debtors. But defendants entered into the Purchase Agreement freely, after months of negotiations, and I cannot

■ Two types of accounts receivable are exceptions to this general rule. First, defendants argue that Norwest should not have claimed as Credit Losses the accounts receivable for which it has made new agreements with the intermediaries. *See id.* at 176–82. Norwest can claim these accounts as Credit Losses up to the amount owed on the loan at the time of the Closing, because defendants guaranteed those amounts and Finvercon did not receive the money. But defendants do not owe any money for any breach of the new agreements that the intermediaries made with Norwest, because defendants did not guarantee payments by the intermediaries. Similarly, Norwest may not assess punitive interest on any payments missed once the intermediaries assumed responsibility for the accounts, because defendants did not guarantee that the intermediaries would pay on time.

Second, Norwest may not claim as Credit Losses accounts that already were 180 days past due at the time of the Closing. Defendants undertook to reimburse Norwest "upon the occurrence of any Credit Loss." Pl.Ex. 1, at § 7.1. Where an account already was 180 days past due at the Closing, that account is not covered by § 7.1 because the "occurrence" took place before the Purchase Agreement came into effect.[9] Norwest may still recover the money it lost on those accounts, however, because Finvercon was fully reserved for those accounts at the time of the sale. *See* Trial Tr. at 88–89, 114–15. In order to cover those accounts, Finvercon transferred its reserves to Norwest as part of the Contin-

gent Portion of the Purchase Price. *See id.* Norwest is entitled to keep those reserves if the accounts are not collectible.[10]

### c. Review by neutral accountant

The parties have agreed to submit the implementation of the Court's rulings regarding the payment of Credit Losses to an accountant (the "Accountant"). The Accountant, who will be appointed by the Court, will apply this Court's rulings to Finvercon's data and submit a report to the Court which will be incorporated in the final judgment.

### 2. Counterclaim Regarding Proof of Collection Activities

■ Defendants seek an order that Norwest must present proof of its good faith efforts to collect accounts receivable and prevent liabilities before seeking reimbursement from defendants, who cannot monitor collection activities now that they have been fired. This counterclaim is denied for three reasons. *First,* defendants premise the counterclaim on the fact that Norwest wrongfully terminated them but, as discussed below, their termination was proper. *See* pp. 226–32, *infra. Second,* defendants have presented no evidence that Norwest engaged in any bad faith delay in collecting accounts receivable or preventing liabilities. Defendants alleged that Norwest stopped trying to collect accounts receivable because they knew that defendants eventually would pay for them, but offered no evidence to support this allegation.[11] In addition, Fernández

---

rewrite the Purchase Agreement. In addition, defendants could have stopped the mounting punitive interest charges at any time by paying the Credit Loss demands.

9. Because Norwest cannot claim these accounts as Credit Losses, it also cannot charge punitive interest on those accounts.

10. This ruling does not conflict with the ruling above that Norwest was not required to offset Credit Losses against the Contingent Portion of the Purchase Price, *see* pp. 20–25 *supra,* because the accounts that were 180

days past due at the Closing are not Credit Losses.

11. For example, defendants introduced a memo from John Deal to Fernández and several others, dated September 2, 1998, indicating that no more time or money should be spent trying to collect accounts more than 180 days past due. *See* Defendants' Exhibit ("Defs.Ex.") AA. In that same memo, however, Deal stated that "Finvercon employees should only be spending their time working accounts that are 31–60, 61–90, 91–120, and 121–179 days past due." *See id.* In addition,

blamed mounting Credit Losses on a number of factors—computer system problems, Norwest's demand for clean credit records, delays in getting decisions made, Norwest's requests for reports and other documentation, and Norwest's insistence that Finvercon employees call customers at inconvenient times—but none of those factors is evidence that Norwest ceased collection activity in reliance on defendants' obligation to reimburse it for Credit Losses. *See* Trial Tr. at 629–34, 638–41. *Third,* defendants did not bargain for a right to demand this proof during their protracted negotiations with Norwest. Their inability to verify the collection activities represents another unfortunate consequence of the bad deal struck by defendants—once Norwest properly fired them for cause, the defendants had no way to monitor efforts to collect the accounts for which they were responsible.

### 3. Counterclaim Regarding Assignment of Right, Title and Interest

■ Defendants seek a declaratory judgment stating that Norwest must assign to them all promissory notes and documentation required to foreclose on the Credit Losses simultaneously with their reimbursement of the Credit Losses to Norwest. Section 2.2(b) of the Purchase Agreement states, in relevant part:

> When the Company determines that an Account Receivable is a guaranteed Credit Loss, and provided that such Credit Loss is within the Closing Provisions and has been reimbursed to the Company by Sellers pursuant to the terms hereof, then the Company shall *assign to* Sellers, *without recourse,* all of Company's right, title and interest in said Account Receivable.

Pl.Ex. 1, at § 2.2(b). Because defendants are ordered to reimburse Norwest for its claimed Credit Losses, it makes sense to clarify defendants' rights under this provision.

Defendants argue that Norwest's transfer of its right, title, and interest in a particular account receivable should be simultaneous with defendants' reimbursement to Norwest of the Credit Loss from that account. By using the language "provided that such Credit Loss ... has been reimbursed ..., *then* the Company shall assign ...," however, § 2.2(b) makes clear that the assignment takes place after the reimbursement—they are not simultaneous. Once defendants have reimbursed Norwest for a claimed Credit Loss, Norwest must assign "all of [its] right, title and interest" in that account. Defendants express some concern about whether Norwest will be able to make this assignment, but they have failed to substantiate their concern.

### B. Termination

Norwest seeks a declaratory judgment that its termination of defendants was proper. Although both sides agree that the Director Agreements are governed by Argentine law, they disagree over which branch of Argentine law controls. According to Norwest, the Director Agreements are controlled by Argentine commercial law and defendants were terminated properly because they violated §§ 1.4 and 1.5 of those agreements. Defendants, on the other hand, contend that the Director Agreements are governed by Argentine labor law, under which Norwest did not have good cause to terminate them.

Section 1.4 of the Director Agreements states:

> The President may be immediately discharged for Cause or Unacceptable Performance without liability for directors fees or other compensation after the date of the discharge and without any other liability to the President.

---

Fernández testified that he refused to implement the policy laid out in Deal's memo. *See* Trial Tr. at 643–46. Thus, the Deal memo does not prove that Norwest or Finvercon stopped trying to collect accounts receivable.

Pl.Ex. 2, at § 1.4.[12] Section 1.5 of the Director Agreements states:

(a) Cause means: violation of a company policy including, without limitation, Norwest's Code of Ethics, a copy of which is attached hereto as Annex I; personal dishonesty, misconduct, or a breach of fiduciary duty; or failure to perform any obligation contained in this Agreement or the Stock Purchase Agreement; or violation of any criminal law (other than traffic violations or similar minor offenses).

(b) Unacceptable Performance means failure to attain reasonable business goals established by the Company and communicated in writing to [Fernández], when said failure has continued for 30 days without adequate measures being taken to correct the failure, after notice specifically identifying the goal(s) not being attained.

Pl.Ex. 2, at § 1.5.[13]

### 1. Which law applies?

The first issue is whether the Director Agreements are governed by the commercial law or the labor law of Argentina. Each side offered testimony from an expert in Argentine law. "Determination of a foreign country's law is an issue of law." *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir.1998) (citing Fed.R.Civ.P. 44.1). The Second Circuit has explained how courts should treat the testimony of experts on foreign law: "[I]t is not the credibility of the experts that is at issue, it is the persuasive force of the opinions they expressed." *Id.*

Norwest offered the testimony of Dr. Ruben Segal, who has practiced law in Argentina for almost 40 years and taught law in Argentina for more than 20. *See* Trial Tr. at 341–43; Pl.Ex. 96. Dr. Segal explained that, under Argentine law, labor

agreements are characterized by three elements of subordination—economic dependency, technical dependency, and juridicial dependency. *See* Pl.Ex. 54, at 4. Economic dependency means that the employee is receiving a salary and other benefits from his employer. *See* Trial Tr. at 356. Technical and juridicial dependency mean that the employee is part of an organizational structure in which he has superiors and that the employee must follow the orders of his superiors without judging them. *See id.* at 355–56. Dr. Segal then explained that Presidents and Vice Presidents are not considered employees of their companies under Argentine law, because there is no subordinate relationship. *See id.* at 359–60. Dr. Segal offered his opinion that the Director Agreements were not labor agreements under Argentine law, and therefore that they were governed by Argentine commercial law. *See id.* at 354–55. On cross examination, however, defendants established that Dr. Segal did not consider the complicated nature of the relationship between Norwest, Finvercon, and defendants when reaching his conclusion. *See id.* at 375–80. Specifically, Dr. Segal was questioned about a corporate chart, which he had not seen previously, indicating that Iribarren supervised Fernández. *See* Defs. Ex. EEE.

Defendants offered the testimony of Dr. Jorge Rodríguez Mancini, who has served as an appellate and supreme court justice in Argentina and also has practiced in the labor and employment field. *See* Trial Tr. at 840–41, Pl.Ex. 56, at 1–2. Like Dr. Segal, Dr. Rodríguez Mancini emphasized that labor relationships in Argentina are characterized by the dependency of the employee on the employer, noting the specific characteristic of receiving orders but not listing the three requirements outlined by Dr. Segal. *See* Trial Tr. at 843. Dr. Rodríguez Mancini explained that, in his

---

12. In Lanzillotta's Director Agreement, all references to "President" are to "Vice President." *See* Pl.Ex. 3, at § 1.4.

13. In Lanzillotta's Director Agreement, all references to "Fernández" are to "Lanzillotta" and all references to "President" are to "Vice President." *See* Pl.Ex. 3, at § 1.5.

view, Norwest had contracted the services of defendants to work at Finvercon. *See id.* at 880–82; Pl.Ex. 56, at 4. Finally, Dr. Rodríguez Mancini offered his opinion that, under Argentine labor law, Norwest had not given defendants sufficient notice of their termination, because Argentine labor law requires detailed written notification. *See* Trial Tr. at 855–56.

On cross examination, Norwest exposed two serious flaws in Dr. Rodríguez Mancini's testimony. First, Dr. Rodríguez Mancini thought that the repeated references to "the Company" in the Director Agreements referred to Norwest, when in fact that term referred to Finvercon. *See id.* at 905–06. This confusion was magnified when Dr. Rodríguez Mancini was asked who paid defendants' salary, because much of Dr. Rodríguez Mancini's argument was premised on his belief that Norwest paid defendants. *See id.* at 877–80. Norwest questioned Dr. Rodríguez Mancini about receipts indicating that defendants had received monthly payments, from January through August 1998, from Finvercon. *See id.* at 907–10; Pl.Ex. 62. Dr. Rodríguez Mancini explained his understanding that those payments were not the compensation described in § 1.2(a) of the Director Agreements. *See* Trial Tr. at 909–10.[14]

Second, Norwest demonstrated on cross examination that Dr. Rodríguez Mancini has a potentially large conflict of interest. On direct, Dr. Rodríguez Mancini explained that he represents defendants in a lawsuit against Norwest and Finvercon currently pending in the labor courts of Argentina, based on the same events at issue in this case. *See id.* at 848–50. Dr. Rodríguez Mancini also explained that his original fee was a contingency fee, but that the parties changed the fee arrangement to a flat fee. *See id.* at 851–52. On cross, Dr. Rodríguez Mancini admitted that his original contingency fee was 20% of any recovery. *See id.* at 891–92. Dr. Rodríguez Mancini also admitted that, under his current flat fee arrangement, he retains the right to seek fees from Norwest, if Fernández and Lanzillotta prevail; this is a typical arrangement under Argentine law, allowing for fees of 15–17% of the total recovery. *See id.* at 898. In addition, Dr. Rodríguez Mancini testified that he had found no facts indicating that defendants did not have an employment relationship with Norwest, while admitting that his ethical responsibilities as a lawyer would prevent him from disclosing such information. *See id.* at 931, 937–39.[15]

Any conflict in the testimony of Dr. Segal and Dr. Rodríguez Mancini turns out to be immaterial, as the question of whether the Director Agreements are governed by the commercial or labor law of Argentina can be decided based solely on the areas of agreement between the two experts. Both Dr. Segal and Dr. Rodríguez Mancini stated that Presidents and Vice Presidents cannot be employees of their companies under Argentine law. *See id.*

14. Although it was not mentioned during the cross examination, the Court notes that § 1.2(c) of the Director Agreements indicates that "the Company"—i.e., Finvercon—will pay for medical insurance. *See* Pl. Exs. 2, 3, at § 1.2(c). That is the only contractual indication of who paid defendants.

15. Norwest moved to strike all of Dr. Rodríguez Mancini's testimony, arguing that he cannot serve as a neutral expert on a matter in which he has a financial interest and binding ethical duties to his clients. I will not strike Dr. Rodríguez Mancini's testimony, however, because sources of foreign law do not have to be admissible. "The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed.R.Civ.P. 44.1. The Second Circuit has "urge[d] district courts to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations." *Curley v. AMR Corp.,* 153 F.3d 5, 13 (2d Cir.1998). On the other hand, I cannot help but consider Dr. Rodríguez Mancini's serious infirmities when deciding what weight to give his testimony. "An expert witness's bias goes to the weight, not the admissibility, of the testimony, and should be brought out on cross-examination." 4 *Weinstein's Federal Evidence* § 702.06[8], at 702–59 (2d ed.1999).

at 359–60, 922–23. Thus, defendants could not have been employees of Finvercon. In addition, both Dr. Segal and Dr. Rodríguez Mancini stated that an employment relationship under Argentine law is characterized by subordination and dependency. *See id.* at 354–56, 843. Dr. Segal mentioned three specific factors, one of which was economic dependency; Dr. Rodríguez Mancini did not mention those factors, but emphasized his belief that Norwest paid the defendants. *See id.* at 356, 877–80. Applying the economic dependency factor to this case, defendants could not have been employees of Norwest because Norwest did not pay them. Receipts from January through August 1998 demonstrate that Finvercon paid defendants a monthly installment equal to the amount provided for in § 1.2(a) of the Director Agreements. *See* Pl.Ex. 62.

Indeed, defendants must have recognized that the payments from Finvercon would cause problems for their case, because both they and their expert pushed the boundaries of logic and reason in an effort to explain how those payments were not the compensation described in § 1.2(a). *See* Trial Tr. at 271–80, 906–22, 973–80. But their verbal gymnastics cannot change the fact that the amounts of the monthly installments equaled 1/12th of the total annual compensation provided for in the Director Agreements.

The conclusion that the Director Agreements are governed by Argentine commercial law rather than Argentine labor law is supported by two other pieces of evidence. *First,* I credit Iribarren's testimony that Fernández was the one who suggested structuring the relationship between Finvercon and defendants as a commercial, not employment, relationship. *See id.* at 75–76. *Second,* on September 3, 1998, Fernández wrote a memo to John Deal, responding to Deal's instructions regarding credit collection, in which he stated:

I ... inform you of my formal rejection of the instructions, and that I shall continue to conduct the business of [Finver-con] in accordance with the procedures and laws of the Republic of Argentina, given that I believe that your instructions endanger the capital of the company, which I, as a director, must preserve, as required by the charter/bylaws, the shareholders and the law.

Defs. Ex. DD. These statements indicate that, less than three weeks before he was fired, Fernández thought he could disregard Norwest's instructions in favor of his duties as a director of Finvercon.

## 2. Did Norwest properly terminate defendants?

The next question is whether Norwest properly terminated defendants for cause. Their Director Agreements state that defendants could be discharged for "Cause or Unacceptable Performance," with "Cause" defined as, in relevant part: "failure to perform any obligation contained in this Agreement or the Stock Purchase Agreement...." Pl. Exs. 2, 3, at §§ 1.4, 1.5(a). Norwest contends that it properly terminated defendants because they violated the Purchase Agreement by failing to post the collateral required in § 5.11 and by failing to pay the tax judgment as required by §§ 7.2 and 7.3.

### a. Collateral

First, Norwest contends that it properly terminated defendants because they failed to post the collateral required in § 5.11 of the Purchase Agreement, which states:

Sellers shall provide to the Company at Closing collateral, satisfactory to Buyers, in the form of dollar-denominated bonds issued by the Republic of Argentina with a residual face value of not less than the amount of Taxes actually deferred as of the Closing.

Pl.Ex. 1, at § 5.11. Defendants admit that they did not provide the collateral at the Closing; Norwest admits that it did not demand the collateral at the Closing. Norwest did demand the collateral on September 10, 1998, after the Argentine tax

authority (the "DGI") obtained a judgment against Finvercon following the disallowance of the February, March and April 1997 tax deferrals. Defendants did not post the collateral in response to the September 1998 demands, and Finvercon paid the tax judgment.

Defendants contend that they did not breach the Purchase Agreement because Norwest waived the collateral requirement. Defendants look to four possible sources for this waiver: (1) Norwest's failure to demand the collateral at the Closing; (2) the joint statement to the Central Bank that "all of the terms and conditions of the [Purchase] Agreement necessary to consummate the transaction have been satisfied;" (3) the alleged statement of Shari Del Carpio, a Norwest employee, to the defendants in February or March of 1998 that they did not have to post the collateral;[16] and (4) a chart attached to a memo prepared by Del Carpio on March 18, 1998, indicating that the posting of the collateral had been completed on January 7, 1998.[17]

None of these sources, however, provides the basis for a finding of waiver. First, Norwest's failure to demand the collateral at the Closing was not a waiver because § 13.6 of the Purchase Agreement states that "[n]either the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege." *See* Pl.Ex. 1, at § 13.6. "No-waiver" provisions which cover course-of-conduct waivers are enforceable. *See Van–Go Transport Co. v. New York City Board of Education,* 53 F.Supp.2d 278, 297–98 (E.D.N.Y.1999) (noting that "parties seeking to limit the effect of the waiver of contractual rights through a course of conduct inconsistent with the terms of the contract have employed non-waiver provisions" that explicitly include course of conduct and citing cases upholding such clauses). Second,

the joint statement to the Central Bank was not a waiver because that statement contained the following limitation:

This joint statement of Sellers and Buyer is for the sole purpose of satisfying a closing condition of the Central Bank of the Republic of Argentina and is of no force or effect for any other purpose. This joint statement specifically does not limit, in any manner, the continuing obligations, representations and warranties made by Sellers and Buyer in the Agreement or representations or warranties that were made by Sellers and Buyer relating to Finvercon in connection with the purchase of the Finvercon capital stock by Buyer.

Defs. Ex. E–5. Finally, neither the chart attached to Del Carpio's memo nor her alleged statement to defendants was a waiver because the Purchase Agreement states that "no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party." Pl. Ex. 1, at § 13.6. *See Bigda v. Fischbach Corp.,* 898 F.Supp. 1004, 1013 (S.D.N.Y. 1995) (finding no waiver because agreement contained requirement that any waiver had to be in writing). Thus, Norwest did not waive the right to demand the collateral.

Defendants also argue that they did not breach the Purchase Agreement because it was impossible to post the collateral, which consisted of accounting records and not physical objects. This argument is a red herring. Section 5.11 simply states that "Sellers shall provide . . . collateral . . . in the form of dollar-denominated bonds . . ." Pl.Ex. 1, at § 5.11. Nothing in the Purchase Agreement states that the bonds had to be carried physically to the Closing. Similarly, none of Norwest's demand letters contained such a requirement. In its September 17, 1998 letter, Norwest did

---

**16.** *See* Trial Tr. at 676.

**17.** *See* Defs. Ex. MMM.

demand that defendants "deliver" the bonds to Mario Olive. *See* Pl.Ex. 81. This choice of a single verb, however, is not a strong enough foundation for defendants' claim of impossibility. All defendants had to do—and all Norwest asked them to do—was to comply with their responsibilities under the Purchase Agreement. Defendants failed to do so, and therefore they breached the Purchase Agreement. Because Norwest could have used the collateral to pay the tax judgment, defendants' breach was material and constituted a proper basis for termination.

### b. Tax judgment

■ Second, Norwest contends that it terminated defendants because they failed to pay the tax judgment obtained by the DGI. Section 7.2 of the Purchase Agreement states:

> Sellers [defendants] jointly and severally undertake to hold harmless the Buyer [Norwest] and the Company [Finvercon] from any Noncredit Loss and to reimburse the Company upon the occurrence of any Noncredit Loss. This obligation is absolute and binding and Sellers [defendants] waive any defense they may have in connection therewith and any right or claim of offset.

Pl.Ex. 1, at § 7.2. The term "Noncredit Loss" is defined in § 2.2(c) of the Purchase Agreement, which states, in relevant part:

> A Noncredit Loss is any loss incurred by the Company after the Closing and resulting directly or indirectly from a breach of any Sellers' warranty or representation, or any failure by Sellers to perform any of their covenants, agreements or obligations contained in this Agreement, whether said loss is incurred as a result of a judicial determination or otherwise, after all reasonable defenses available, in Buyer's reasonable judgment, have been raised by the Company, including, without limitation, any loss incurred in connection with Taxes or penalties imposed by regulatory authorities.

Pl.Ex. 1, at § 2.2(c). In addition, § 7.3 of the Purchase Agreement states, in relevant part:

> Sellers [defendants] jointly and severally undertake to hold harmless the Company [Finvercon] and the Buyer [Norwest] for owning the Tax Benefits Companies and for the Company's obligations under the Tax Benefits Regime. Sellers undertake to pay, and to indemnify the Company against, all expenses, taxes, costs, fees, bank or other guarantees or any disbursement or liability that may have to be made or suffered by the Company by virtue of the Tax Benefits Regime, including, without limitation, payment of any deferred Taxes.

Pl.Ex. 1, at § 7.3

I have already found that Salvador Pristera did not inform anyone at Norwest or Finvercon about the tax problem until late August, when the DGI obtained a judgment against Finvercon. *See* pp. 218–19, *supra*. It is undisputed that this judgment gave the DGI the power to seize Finvercon's assets; Fernández admits that he knew of this possible consequence. Norwest demanded that defendants pay the tax judgment on August 31, September 2, and September 3, 1998. Defendants did not comply with these demands, and Finvercon itself paid the tax judgment on September 3, 1998.

Defendants argue that they did not breach the Purchase Agreement by failing to pay the tax judgment, because Norwest failed to comply with the notification provision found at § 12.3(b), which states:

> Promptly after receipt by an Indemnified Person of notice of any Proceeding or other matter for which an Indemnified Person may claim to be indemnified such Indemnified Person will give notice to Seller of such claim, but the failure to notify the Seller will not relieve the Sellers of any liability that it may have to any Indemnified Person, except to the extent that the Sellers demonstrate that the defense of such Proceeding or other

matter is prejudiced by the Indemnified Person's failure to give such notice.

Pl.Ex. 1, at § 12.3(b). Defendants contend that Norwest learned of the tax problem either in February or April 1998 but failed to notify them until August 1998, and that this failure prejudiced their defense. I have already found, however, that Salvador Pristera was the only Finvercon or Norwest employee who knew about the tax problem before August 1998. The defendants do not argue that Pristera's knowledge can be imputed to Norwest. Therefore, Norwest could not have violated § 12.3(b) by failing to notify the defendants about the tax problem.

Defendants also argue that they did not breach the Purchase Agreement by failing to pay the tax judgment because they needed time to investigate whether Finvercon had raised "all reasonable defenses available," as required by § 2.2(c). Under the Purchase Agreement, however, Norwest—not defendants—makes that determination. *See* Pl.Ex. 1, at § 2.2(c). On September 16 and 17, 1998, Norwest informed defendants of its conclusion that Finvercon had raised all reasonable defenses and that defendants were liable for the tax judgment. Thus, even if Norwest's failure to reach this conclusion by September 3 excuses defendants' failure to reply to the demands made on August 31, September 2, and September 3, defendants had no excuse for not complying with the demands made on September 16 and September 17, after Norwest had made its determination that Finvercon had raised all reasonable defenses.

Defendants eventually reimbursed Finvercon for the tax judgment on October 8, 1998, and now seek to recover that payment by arguing that Finvercon did not raise all reasonable defenses. *See* pp. 232–34, *infra*. Even if defendants had a plausible argument that Finvercon had failed to raise all reasonable defenses, however, the structure of the Purchase Agreement makes clear that, once Norwest made its determination that Finvercon had raised all reasonable defenses, defendants were required to reimburse Finvercon for the tax judgment. Defendants could not refuse to pay the tax judgment because they disagreed with Norwest's determination.

Thus, Norwest properly terminated defendants for cause under § 1.5 of their Director Agreements, because defendants failed to post the collateral required by § 5.11 of the Purchase Agreement and failed to pay the tax judgment as required by §§ 7.2 and 7.3 of the Purchase Agreement.[18]

## C. Specific Performance of Collateral Requirement

■ In addition to using the failure to post the collateral as cause for terminating defendants, Norwest also seeks specific performance of the collateral requirement. Both parties agree that all of the taxes have been paid, but Norwest argues that the DGI might still seek to recover interest on those payments. Section 5.11 states that defendants were required to provide collateral "with a residual face value of not less than the amount of Taxes actually deferred as of the Closing." Pl.Ex. 1, at § 5.11. Collateral for "the amount of taxes actually deferred" is synonymous with collateral for the amount of the principal. It does not include collateral for any possible interest. The principal has been paid and the collateral requirement therefore rendered moot. Norwest's motion for specific performance of the collateral requirement is denied.

## D. Counterclaim Regarding Tax Payments

■ Defendants assert that they are entitled to reimbursement of the money

---

**18.** Norwest also argues that defendants breached the Purchase Agreement by making personal loans while they were employed by Finvercon. Because I conclude that defendants breached the Purchase Agreement by failing to provide the collateral and by failing to pay the tax judgment, I do not need to address this issue.

they paid Finvercon for the tax judgment because Norwest and Finvercon failed to comply with their obligations under §§ 12.3(b) and 2.2(c) of the Purchase Agreement. In addition, defendants seek reimbursement for foregoing other tax deferrals.

First, defendants argue that they were not required to pay the tax judgment because Norwest failed to comply with the notification provision of the Purchase Agreement found at § 12.3(b). As explained above, however, Norwest did not learn about the tax problem until August 1998, when the DGI obtained the tax judgment, and therefore could not have violated § 12.3(b) by failing to notify defendants. *See* pp. 231–32, *supra.*

Second, defendants argue that they were not required to pay the tax judgment because Finvercon failed to raise "all reasonable defenses available," as required by § 2.2(c) of the Purchase Agreement. Finvercon received notice of the tax problem in February 1998, when Salvador Pristera, a Finvercon accountant and the person responsible for tax matters at Finvercon, was informed of the problem by the DGI. *See* Undisputed Facts at ¶ E. Pristera did not tell anyone about the tax problem in February 1998. In April 1998, when he received notification that the DGI was commencing legal proceedings against Finvercon, Pristera's only action was the referral of the matter to the Pardo law firm.

But Finvercon's inaction is not enough; the question is whether Finvercon could have raised any reasonable defenses to the disallowance of the tax deferrals. Under the Purchase Agreement, Norwest—not defendants—makes that determination. *See* Pl.Ex. 1, at § 2.2(c). In September 1998, Norwest concluded that Finvercon had raised all reasonable defenses. *See* Pl. Exs. 80, 81. This Court must consider whether Norwest's determination was reasonable.

Norwest offered the testimony of Dr. Adolfo Atchabahain, an expert in Argentine tax law, who explained that Finvercon had filed its VAT applications for February, March, and April 1997 after the filing deadlines had passed and that, under Argentine tax law, the late filing of a VAT application causes that application to be nullified, even if the filing was only one day late. *See* Trial Tr. at 214–15. Dr. Atchabahain then offered his opinion that Finvercon had no hope of appealing this determination, because "neither the law nor the regulations or the rulings from the tax board provide any way to solve, to overcome such a consequence once the tax deferral benefit have [sic] been filed untimely." *See id.* at 218. Nevertheless, Dr. Atchabahain did note that, when it received notification of the problem in February, Finvercon had five days to pay the taxes without incurring penalties and interest. *See id.* at 211, 215.

Defendants did not offer their own expert on Argentine tax law. On cross-examination of Dr. Atchabahain, defendants established that Finvercon could have sought a review of the February notice of deficiency by the Director General, although Dr. Atchabahain remained steadfast in his view that such a proceeding would not have been successful, both because Finvercon was not raising a contention concerning the interpretation of the tax law and because Finvercon had filed the applications late. *See id.* at 215–16, 227–35. In addition, defendants asked Dr. Atchabahain whether there were any cases in which the failure to file VAT deferral applications on time had been ruled a mere technicality that did not invalidate the application; Dr. Atchabahain said he was not aware of any such decisions. *See id.* at 237–40. During this exchange, defendants referred to two specific cases, but did not discuss their facts or holdings. *See id.* at 237–39.

Norwest's determination that Finvercon had raised all reasonable defenses to the payment of the taxes was reasonable. Finvercon was not required to raise every possible defense—only those that might

succeed. Dr. Atchabahain's testimony made clear that, once the deferrals had been disallowed, Finvercon had no chance to defend the disallowance successfully. Defendants did not offer any persuasive evidence to contradict that opinion.[19]

On the other hand, Finvercon did not take all reasonable steps to prevent the imposition of penalties and interest, and any determination by Norwest that Finvercon had done so would be unreasonable. When it received the notice in February, Finvercon had a five-day period in which it could have paid the taxes without incurring any penalties or interest. Finvercon did not pay the taxes within that five-day period, because Pristera did not tell anyone about the disallowance of the deferrals. Because Finvercon could have prevented the assessment of penalties and interest on the taxes, defendants should not be liable for them. Accordingly, Norwest should reimburse defendants for any payments of penalties and interest flowing from the tax judgment, although it should not reimburse defendants for the taxes themselves.

Defendants also seek reimbursement from Norwest for their early payment of other deferred taxes. Fernández testified that he paid $1,800,000 in deferred taxes years before their due date. *See id.* at 673–74. Fernández now argues that he made these payments because he feared that Norwest and Finvercon would incur penalties and interest on those deferrals as well. Consequently, he seeks reimbursement for the value of the lost deferrals. But Fernández has failed to provide any evidence as to how Norwest made him forego the deferrals, and therefore Norwest is not liable for any losses he might have suffered.

### E. Counterclaim for Accounting of Reserve Funds

Defendants seek an order stating that, before defendants must pay any claimed Credit or Noncredit Losses, Norwest must provide defendants with a full and detailed accounting, verified by an independent auditor, of the status and maintenance of the reserve funds known as the Contingent Portion of the Purchase Price (for Credit Losses) and the Reserve Holdback for Noncredit Losses (for Noncredit Losses). "The right to an accounting rests upon a trust or fiduciary relationship and a duty upon the part of the defendant to account, or, under a joint venture agreement whereby the seller is to participate in losses as well as profits, or, where special circumstances are present warranting equitable relief in the interest of justice." *Grossman v. Laurence Handprints–N.J., Inc.*, 90 A.D.2d 95, 455 N.Y.S.2d 852, 858 (2d Dep't 1982) (citations omitted). New York courts have made clear that "[a]n allegation of wrongdoing is not an indispensable element of a demand for an accounting where the complaint indicates a fiduciary relationship between the parties or some other special circumstances warranting equitable relief." *Morgulas v. J. Yudell Realty*, 161 A.D.2d 211, 554 N.Y.S.2d 597, 600 (1st Dep't 1990); *Adam v. Cutner & Rathkopf*, 238 A.D.2d 234, 656 N.Y.S.2d 753, 759 (1st Dep't 1997) (citing *Morgulas*).

Defendants have demonstrated that they are entitled to an accounting of the Contingent Portion of the Purchase Price and the Reserve Holdback for Noncredit Losses, because Norwest has a fiduciary duty to maintain those reserve funds for defendants. *See Stevens v. St. Joseph's Hospital*, 52 A.D.2d 722, 381 N.Y.S.2d 927, 929 (4th Dep't 1976) ("The fiduciary relationship necessary to obtain an accounting is created by the plaintiff entrusting to the defendant some money or property with respect to which the defendant is bound to reveal his dealings."); *see also Chipman v. Steinberg*, 106 A.D.2d 343, 483 N.Y.S.2d 256, 258 (1st Dep't 1984) ("[T]here must be something—property, cash, even services—which has been given over and em-

---

**19.** If defendants think they can convince the DGI to permit the deferrals, they have until 2003 to bring such claims. *See* Trial Tr. at 217–18, 226.

ployed by another before that other can be liable as a fiduciary [to provide an accounting].”). The Purchase Agreement details when Norwest must return both reserve funds to defendants and provides both for interest and for deductions. *See* Pl.Ex. 1, at §§ 2.2, 2.5. Norwest should account for the status of those funds.[20]

Defendants also argue that Norwest must provide the accounting before defendants make any payments for Credit or Noncredit Losses. But because Norwest has no obligation to offset any claimed Credit or Noncredit Losses against either of these reserve funds, the accounting of those funds has no impact on the timing of the payment of the Credit Losses.[21] I have already explained why Norwest has no obligation to offset any Credit Losses against the Contingent Portion of the Purchase Price. *See* pp. 221–23, *supra.* As for Noncredit Losses, § 2.2(c) of the Purchase Agreement states that Norwest has “the right, but not the obligation, to charge the amount of [any] Noncredit Loss, or any portion thereof, against the Reserve Holdback for Noncredit Losses.” Pl.Ex. 1, at § 2.2(c). In addition, § 7.2, which details the defendants’ guarantee for the Noncredit Losses, states that the defendants waive “any right or claim of offset.” Pl.Ex. 1, at § 7.2.

Thus, while defendants’ counterclaim for an accounting of the status and maintenance of the reserve funds is granted, the timing of that accounting has no impact on the payment of the Credit Losses.

**F. Enforcement of Non–Competition Agreement**

 Norwest seeks a preliminary and permanent injunction to prevent defen-

dants from violating their obligations to Finvercon under § 1.3(a) of the Director Agreements, which states:

> (a) The President shall not, directly or indirectly, own, manage, operate, invest in (other than as a personal investment in publicly traded corporations), control, be employed by, participate in, be a financial sponsor of, provide consultation services to, or be connected in any manner with, the ownership, management, or control of any proprietorship or other entity engaged in providing services engaged in by Finvercon at the end of his Appointment Period anywhere in Argentina. The restrictions in this paragraph 3(a) shall be in full force and effect from Closing until three years after the President ceases to hold his position.

Pl.Ex. 2, at § 1.3.[22] Norwest argues that the authority for injunctive relief can be found in § 2 of the Director Agreements, which states:

> The President understands that the Company’s [Finvercon’s] remedy at law for any breach of any of the President’s obligations under this Agreement would be inadequate and agrees that temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provisions of this Agreement, without the necessity of proof of actual damage. The President agrees that injunctive relief is not an exclusive remedy and the Company shall have the right to seek, in addition to injunctive relief any remedy in law or equity.

Pl.Ex. 2, at § 2.[23]

Although this provision might give Norwest the power to seek an injunction, Nor-

---

**20.** The Accountant who will be implementing the Court’s rulings regarding the payment of Credit Losses also will perform this accounting.

**21.** The only connection between the Credit Loss demand and the reserve funds is that Norwest must deduct from its Credit Loss demand those accounts receivable that were

180 days past due at the time of the Closing. *See* pp. 224–25, *supra.*

**22.** In Lanzillotta’s Director Agreement, all references to “President” are to “Vice President.” *See* Pl.Ex. 3, at § 1.3.

**23.** In Lanzillotta’s Director Agreement, all references to “President” are to “Vice President.” *See* Pl.Ex. 3, at § 2.

west has failed to demonstrate the need for an injunction. Section 1.3(a) bars defendants, broadly speaking, from participating in any entity "engaged in providing services engaged in by Finvercon." Pl.Ex. 2, at § 1.3(a). Finvercon argues that, both before and after their termination, defendants engaged in personal lending, a service also engaged in by Finvercon. But the evidence demonstrates that defendants never made a single loan that otherwise would have been made by Finvercon. Finvercon now has a policy against lending to commercial entities, which made up the bulk of the defendants' loans, and does not lend money to individuals outside Argentina, which means Finvercon could not have lent money to Hugo Iurcovich, a Brazilian. Thus, Finvercon's request for injunctive relief is denied.

## IV. Conclusion

For the foregoing reasons:

1) Norwest must prepare a revised Credit Loss demand in accordance with the terms of this Opinion and Order. Norwest then must supply a copy of this demand to defendants and to the Accountant. In addition, Norwest must provide the Accountant with the data supporting its Credit Loss demand. Applying the terms of this Opinion and Order to the supporting data, the Accountant will submit a report to the Court which will be incorporated in the final judgment.

2) Norwest properly terminated defendants for cause.

3) Norwest's claim for injunctive relief relating to the non-competition clause is DENIED.

4) Norwest's claim for injunctive relief and specific performance of the collateral requirement is DENIED.

5) Norwest must reimburse defendants for the amount of the tax judgment related to interest and penalties arising from the failure to pay the deferred taxes in February 1998. Defendants' other counter-claims related to reimbursement of tax payments are DENIED.

6) Defendants' counterclaim that Norwest provide them with a report of its good faith collection efforts is DENIED.

7) Norwest must provide the Accountant with the necessary data for the Accountant to conduct an accounting of the status and maintenance of the Contingent Portion of the Purchase Price and the Reserve Holdback for Noncredit Losses. The Accountant will conduct the accounting and send its report to both parties. The timing of the accounting has no impact on defendants' obligation to reimburse Norwest for Credit Losses.

8) Once defendants have paid the Credit Loss for a particular account receivable, Norwest must provide defendants with all right, title and interest in that account receivable.

9) Defendants' counterclaim for a declaratory judgment related to Norwest's alleged duty to offset is DENIED.

Upon submission of the Accountant's final report, the parties are to prepare a Final Judgment to be entered by the Court.